J. W. Perry and Ora R. Perry v. Commissioner.
J. W. Perry v. Commissioner
Docket No. 1978.
United States Tax Court
1945 Tax Ct. Memo LEXIS 355; 4 T.C.M. (CCH) 14; T.C.M. (RIA) 45005; January 4, 1945
Ellis D. Bever, Esq., James D. Dye, Esq., and William S. Hogsett, Esq., for the petitioners. Orris Bennett, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves the redetermination of a deficiency of $30,325.55 in income tax for 1937. The issue is whether the amount of $63,500 received in 1937 under the terms of a transaction made in 1936 constitutes taxable income in 1937, as determined by the respondent. Substantially all the facts are set forth in a stipulation of facts which is incorporated herein by reference as part of our findings of fact. Findings of Fact The petitioners are husband and wife and reside in Kansas City, Missouri. They filed a joint income tax return for the taxable year with the *356 collector at Kansas City, Missouri. On May 8, 1930, J. W. Perry, hereinafter referred to as the petitioner, entered into an employment contract with Theodore Gary and Co., a Missouri corporation, hereinafter referred to as Gary, under the terms of which petitioner agreed to perform personal services for Gary and other companies and enterprises affiliated with or controlled or managed by it or them for a period of eight years, at a salary of $75,000 a year. The employment contract was terminated on March 9, 1934, by an agreement under the terms of which Gary agreed to deliver to petitioner 4,750 shares of its first preferred stock, and to place with R. B. Jones and Sons, Inc., an insurance agency in which petitioner was indirectly personally interested at that time, insurance during a period of five years on which the gross premiums at regular tariff rates would amount to at least $680,000, failing in which Gary agreed to pay petitioner as liquidated damages an amount equal to 30 per cent of the deficiency in such premiums. Petitioner agreed, without additional compensation, to give his views on pending matters in his charge, and thereafter lend his cooperation and influence toward *357 the management of Gary and its subsidiary companies. In October 1935 the stock was exchanged for $48,750 face amount of series A income notes of Gary. In December 1935 he exchanged the notes, which were then in the face amount of $39,000, for a like amount of income notes of the Union Investment and Loan Co. At that time, petitioner held another income note of the Union Investment and Loan Co. on which there was an unpaid balance of $8,500. On April 6, 1936, R. B. Jones and Sons, Inc., agreed that if petitioner placed with it for Gary, insurance on which the gross premiums at regular tariff rates were $770,000, that it would obtain reductions of $147,500 on the premiums. The contract was assignable with the approval of R. B. Jones and Sons, Inc., any assignment, however, to be subject to the agreement of the assignee to carry out the terms of the agreement imposed upon petitioner. Petitioner agreed to reimburse R. B. Jones and Sons, Inc., for all amounts paid by them to local agents as commissions in cases where necessary to place any of the insurance with local agents. This contract will hereinafter be sometimes referred to as the Jones contract. On April 7, 1936, petitioner and *358 Cliff C. Jones agreed to save harmless R. B. Jones and Sons, Inc., from two-thirds of any loss it might sustain under the contract. Petitioner and Gary, by an agreement bearing the date of May 4, 1936, released and discharged each other from all claims and demands and canceled all contracts between them. On May 5, 1936, petitioner and the Canadian Telephone & Supplies, Ltd., a Canadian corporation (hereinafter sometimes called Canadian), entered into a contract providing, in consideration of $147,500, payable $60,000 cash and $3,000 on June 1, 1936, and a like amount monthly thereafter until the full amount was paid, with interest at the rate of 5 per cent per annum, payable quarterly, for the assignment of (a) the Jones contract; (b) the notes of Union Investment and Loan Co. in the face amount of $47,500, and (c) a claim in the amount of $20,000 against the Community Telephone Co., for services rendered. The parties agreed that the cash paid should be deemed payment in full of the notes of the Union Investment and Loan Co. and the notes released therefrom to Canadian "as its property" and that the balance of $12,500 of cash, should be applied against the claim against the Community *359 Telephone Co. The claim was to be released from the agreement to Canadian "as its property" when additional payments totaling $7,500 had been made; and upon payment of the remainder of the consideration of $147,500 the agreement was to terminate and the contract between petitioner and R. B. Jones and Sons, Inc., released from the agreement and delivered to Canadian. The contract provided that an executed copy should "be deposited with and held in the custody of Canadian * * *, and that as collateral thereto it shall hold" the three items, i.e., the Union notes, the claim for services, and the Jones contract. Canadian was given the right to liquidate the balance due under the contract at a rate greater than $3,000 a month. The parties agreed that for the purpose of the agreement the notes should have a value of $47,500, the claim against the Community Telephone Co., $20,000, and the contract with R. B. Jones and Sons, Inc., $80,000. On the same day, petitioner executed "for valuable consideration" an assignment of the contract of April 6, 1936, to the assignee, in which it was recited that the assignee would perform any and all conditions of the contract to be performed by petitioner. *360 The assignment was "accepted" by R. B. Jones and Sons, Inc. On May 5, 1936, petitioner made a journal entry in his books crediting "Compensation - Jones Contract" with $80,000 of the amount payable under the contract. At the same time he opened up an accounts receivable account with the Canadian Telephone & Supplies, Ltd., in which he made a charge of $87,500 for the balance payable under the contract. Payments subsequently made were credited to the account. On October 14, 1936, the Canadian Telephone & Supplies, Ltd., transferred its interest in the contract of May 5, 1936, with petitioner to the Kroy Investment Co., Ltd., a Canadian corporation (hereinafter sometimes called Kroy), and Kroy thereby is to "have all the same rights, options and privileges and is to be subject to all the same limitations and restrictions" as Canadian under the contract of May 5, 1936. On the same day, petitioner accepted the Kroy Investment Co., Ltd., as obligor under the contract and released the Canadian Telephone & Supplies, Ltd., from all liability under the agreement. At that time, there was an unpaid balance of $72,500 payable under the contract. The balance due under the contract on December 31, 1936, was *361 $63,500, all of which was paid to petitioner by the Kroy Investment Co., Ltd., in 1937, the last payment on April 12, on which date petitioner gave the Kroy Investment Co., Ltd., a release from liability under the contract. The contract between petitioner and Canadian dated May 5, 1936, did not have a fair market value. The Canadian Telephone & Supplies. Ltd., and Kroy Investment Co., Ltd., were subsidiaries of Gary, a holding company. The petitioners kept their books and filed their income tax returns for 1936 and 1937 on the cash receipts and disbursements basis. In his return for 1936, showing a net loss of $41,587.01, petitioner reported the receipt of $20,000 from the Community Telephone Co. and $80,000 from R. B. Jones and Sons, Ltd. In his determination of the deficiency, respondent held that the payments aggregating $63,500 received by the petitioner in 1937 from Kroy Investment Co., constituted taxable income in that year. Opinion The question in issue is whether the gain realized on the contract made by petitioner on May 5, 1936, with the Canadian Telephone & Supplies, Ltd. is taxable in its entirety in that year, as reported by petitioner, or only as cash was received, *362 as determined by the respondent. Section 111 (b) of the Revenue Act of 1936 provides that: The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. The point of difference between the parties is whether the promise made by Canadian to make the deferred payments constitutes property having a fair market value within the meaning of the statute, and is includible in the computation of gain at such value. Respondent, in substance, contends that as a matter of law the promise to pay contained in the contract between petitioner and Canadian can not be considered to have fair market value, since it was not in the form of a note or bond or other evidence of indebtedness, but was merely an agreement to pay, constituting a part of a contract; also that the evidence showed no market value in the contractual promise. The petitioners, on the other hand, argue that the question is not one of law, but of fact, that the contract being fully executed, a closed and completed transaction, with title and possession delivered, with nothing remaining to be done, except the unconditional *363 liability of Canadian to pay a specified amount of money and the evidence showing that in fact the promise to pay had market value and could have been sold, the promise to pay must be given fair market value. Both sides point to cases from the courts and from the Board of Tax Appeals, tending to support their respective contentions. Thus the petitioners rely upon such cases as S. L. Meyer, Executor, 23 B.T.A. 1201, and Old Colony Trust Co., 12 B.T.A. 1334; while the respondent contends that a different rule is laid down in later cases, particularly C. W. Titus, Inc., 33 B.T.A. 928, and Alice G. K. Kleberg, 43 B.T.A. 277. We have examined at length the cases cited and the question as to whether, as a matter of law, a promise to pay contained, not in a promissory note or bond or other mere evidence of indebtedness, but in a contract, has fair market value. Upon examination of the facts here involved, however, we find it unnecessary to go into that question, for, as we view the evidence adduced, even upon the petitioner's own theory that the question is always one of fact, we have concluded that the petitioners have not, in fact, shown *364 fair market value in the agreement to pay the $147,500. The petitioners are in error, in our opinion, in the idea that the contract of May 5, 1936, was wholly executed and in no degree executory and that there remained only a mere unconditional promise to pay a specific sum. We find that the agreement to pay money was not the only element remaining in the contractual relations between the parties. Though there was in form an outright assignment of the Jones contract to Canadian, we may and should read the contract of May 5, 1936, together with such assignment which is referred to therein and executed in accordance therewith on the same day by J. W. Perry. 17 C.J.S. 714. The contract was the consideration for the assignment. The record indicates that the assignment was held by Canadian only as collateral until final payment, for the contract of May 5, 1936, provides that "as collateral" Canadian is to hold "the following described items" - including the Jones contract. This is inconsistent with any idea of full delivery, separate from the contract, of the assignment of the Jones contract. We consider both together. The assignment recites particularly that the assignee, Canadian Telephone *365 & Supplies, Ltd., agrees "to carry out and perform any and all things to be performed by the undersigned under said contract" - referring specifically to the contract between J. W. Perry, and R. B. Jones and Sons, Inc., dated April 6, 1936. Under the Jones contract Perry had specific duties, among them that of reimbursing R. B. Jones and Sons, Inc., for all amounts paid by them to local agents as commissions (in connection with placing the insurance for Theodore Gary and Co., which constitutes the background for the whole matter). Though R. B. Jones and Sons, Inc., endorsed the word "accepted" on the assignment, this fact is not shown to constitute release of Perry from his obligation to reimburse for the local commissions. It is thus discerned that the contractual arrangements made between Perry and Canadian Telephone & Supplies, Ltd., on May 5, 1936, bound the latter not only to pay money for the contractual purchase price, but to carry out Perry's agreement with Jones, and that in the absence of such performance Perry would have recourse. The purchaser, under such circumstances, did not know what the total cost to it would be. Though the amount payable to Perry was specific, the *366 total amount payable to him or for his account was by no means so, was in fact indefinite. The contract of May 5, 1936, discloses further dissimilarity between it and a mere promise to pay money, in that in fact (contrary to petitioner's contention) the title to the property sold to Canadian was not to pass until complete payment therefor. The three items sold, that is, the Union Investment notes, the claim against Community Telephone Co., and the contract between Perry and R. B. Jones and Sons, Inc., were not, as the petitioners' theory assumes, delivered outright to Canadian, but were, as the contract recites, placed with the assignee together with an executed copy of the agreement which "shall be deposited with and held in the custody of" Canadian and it being provided that the assignee "shall hold" the items "as collateral thereto." The agreement then proceeds to recite that the $60,000 down payment pays for the Union Investment notes of $47,500 and they are "released from this agreement to Canadian Telephone & Supplies Limited as its property." Next it is provided that the balance of the $60,000, that is $12,500, shall be applied on the $20,000 claim against Community Telephone *367 Co., and that when $7,500 additional has been paid, "the claim against Community Telephone Company shall be released from this agreement to Canadian Telephone & Supplies, Limited, as its property." Finally, it is provided that "this contract shall terminate" and the Jones contract should be "released from this agreement and delivered up" to Canadian upon the payment of the $147,500. In effect, the petitioner was not delivering his property until payment in full. He delivered the Union Investment notes only because the down payment covered them. Under the agreement comprised by contract and assignment, the title to the Jones contract did not pass until 1937, when payment was completed, for under the contract the petitioner, Perry, clearly did not intend to deliver and was not obligated to deliver the Jones contract until that time. It was, in effect, held in escrow, though by the assignee itself. Further recognition of mutual rights and liabilities under the contract with Canadian is found in the agreement between petitioners and Kroy Investment Co., Ltd., to whom on October 14, 1936, Canadian assigned; for therein it is recited that "Kroy is to have all the same rights, options and *368 privileges and is to be subject to the same limitations and restrictions" as Canadian in the contract of May 5, 1936; also, that Perry agrees to deliver to Canadian "a release of all its liabilities and obligations under the contract dated May 5, 1936." Such broad language was unnecessary to describe a mere unconditional obligation to pay a specific sum. That the contract was executory rather than executed, at least as to the Jones contract, as concerns the portion which was represented by the $63,500 paid in 1937, is further indicated by the fact that, under the specific language of the agreement, Canadian was not required even to start paying for the Jones contract for about two and one-half months thereafter, for payments required were $3,000 per month, and the first $7,500 was applicable upon payment for, and to secure release of, the $20,000 claim for services. In other words, the matter of purchase of the Jones contract was contingent upon completion of payment for the $20,000 claim for services, and its release from the agreement. Had default been made on payment for the claim item, it might well have been contended by petitioner that the agreement to sell the Jones contract *369 did not go into effect. We think the essence of the contractual relation was that the petitioner (not yet releasing or delivering the Jones contract) agreed to sell it, in the future, for money to be paid after other items of the contract were disposed of. Such contractual arrangement does not, in our opinion, by any means constitute the mere promise to pay that the petitioners see therein; and it does not constitute property with a fair market value, within the intendment of section 111 (b) of the Internal Revenue Code, not because it may not constitute property in a general sense, but because, in fact, such a mutual executory contract as herein shown does not have fair market value. The situation here is in no essential element distinguishable from that involved in Bedell v. Commissioner, 30 Fed. (2d) 622, where in 1919 a contract was made to sell real estate, to be paid for upon completion of the sale. The court points out that nothing whatever was due unless the title passed; that even though equity regards a vendee before payment as owner, still payment is for the title "and is conditional on its delivery, as much as in the case of chattels, *370 where title has not passed." The court continues to the effect that though even a conditional obligation is "in some sense property, and like anything else that can be transferred, may be said to have a value," nevertheless payment is for title and "will never be made if it is not conveyed." The court concludes that if land or a chattel is sold and title passes merely upon the promise to pay money at some future date," to speak of the promise as property exchanged for the title appears to us a strained use of language, when calculating profits under the income tax. * * * It is absurd to speak of a promise to pay a sum in the future as having a 'market value,' fair or unfair. Such rights are sold, if at all, only by seeking out a purchaser and higgling with him on the basis of the particular transaction." The same language from the Bedell case is specifically approved in Cassatt v. Commissioner, 137 Fed. (2d) 745. Such language seems to us to describe well the kind of sale which the petitioner's evidence indicated could be made of the contract here involved. Though the evidence here shows that the contract might have been sold, we do not think it demonstrates the fact of *371 fair market value. Though witnesses in terms stated that there was fair market value, their evidence, as a whole, in our view, indicated opinion that there was intrinsic value based in part upon knowledge and the financial worth of a third corporation not a party to the contract, and the fact that other buyers could have in their opinion been found. One of the witnesses as to fair market value, the petitioner, explained that by fair market value he meant that the contract was to him worth that money, and obviously relied upon the worth of Gary, which was not the party agreeing to pay, though Canadian was its subsidiary. Another at first believed there was a market for the Perry-Canadian contract, then stated there was. He also considered the Gary Company. The third stated that there was a market for the contract and that he had no doubt the contract could have been sold for face value. When asked the fair market value he stated it to be $87,500, yet he predicated his answer upon the balance sheet statements of Canadian and the evidence of good faith of the maker of the obligation in making cash payment of $60,000, and said that by fair market value he meant that there was no question *372 in his mind based upon the evidence presented to him, that the account would be collected. However, he further stated that he would not advance Canadian anything on its balance sheet alone, but might first consider and inves tigate a lot of things, and that he had never heard anyone discuss the contract, whether there was a market for it, or bids for it. The two witnesses last referred to were bank officers, dealing in commercial paper. The total effect of such evidence is not convincing that the contract here involved had, in fact, fair market value. The very fact that the statute uses "fair market value" instead of mere "value," indicates intent not to permit the inclusion in income of any contract merely because of intrinsic value. It is obvious that where there are mutual duties still to be performed under a contract, a buyer must consider the possibilities inherent in such an arrangement and that such a contract does not lend itself to purchase and sale on a market, but to mere "higgling" as to what one might pay. This is accented in the instant case by the fact that the contract with Jones could be assigned only with the approval of that company and upon the agreement of any *373 assignee to carry out the terms thereof imposed upon J. W. Perry, and by the fact that the assignment thereof contains an express agreement by the assignee to perform Perry's duties thereunder. Taxation being a practical matter, we think Congress never intended to include in income a contract of the nature shown by the evidence herein, despite the opinions above discussed, that there was fair market value. Dudley T. Humphrey, 32 B.T.A. 280. Though admitting the evidence as to actual value of the Jones contract (after reserving ruling on objection hereto), we find and hold that the agreement to pay the petitioner J. W. Perry did not have in 1936 a fair market value. We therefore conclude that the respondent did not err in taxing petitioner in 1937 upon the $63,500 actually received in that year under the agreement of sale. Decision will be entered for the respondent.